682 F.2d 993
 221 U.S.App.D.C. 44, 8 Media L. Rep. 2414
 NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE,
et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Metromedia, Inc., Corinthian Broadcasting Co., et al., Intervenors.
 No. 80-2416.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 27, 1982.
Decided June 29, 1982.
 
 Petition for Review of Orders of the Federal Communications commission.
 Jeffrey H. Olson, Washington, D. C., with whom Amit Pandya, Washington, D. C., was on the brief, for petitioners.
 C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Gregory M. Christopher, Counsel, F. C. C., and Barry M. Grossman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents. David Silberman, Counsel, F. C. C., and Andrea Limmer, Atty., Dept. of Justice, Washington, D. C., also entered appearances for respondents.
 Thomas J. Dougherty, Washington, D. C., with whom Preston R. Padden, Edgar F. Czarra, Jr. and Joseph Volpe, III, Washington, D. C., were on the joint brief, for intervenors, Metromedia, Inc. and Corinthian Broadcasting Corp.
 Thomas H. Wall, Werner K. Hartenberger and Maxine D. Howard, Washington, D. C., were on the statement in lieu of brief, for intervenor, Channel 5 Television Co.
 Thomas N. Frohock and Dennis P. Corbett, Washington, D. C., entered appearances for intervenors, ABC, Inc. and General Electric Broadcasting Co., Inc.
 Before WALD and EDWARDS, Circuit Judges, and DAVIS, Judge.*
 Opinion for the Court filed by Judge DAVIS.
 DAVIS, Judge:
 
 
 1
 Petitioners, NAACP, et al.,[1] challenge the Federal Communication Commission's (FCC or Commission) repeal of the Top-Fifty Policy on television ownership applications. This Policy required, absent a compelling showing in the application that the acquisition would be in the public interest, an evidentiary hearing on the applications of those seeking to acquire a third television station or more than two VHF stations in one of the fifty largest television markets.[2] We uphold the Commission in its latest action.
 
 
 2
 * The Top-Fifty Policy ("Policy") was first adopted in 1964 as an interim policy during an overall review of the problems of concentration in and diversification of the broadcast media. Applications to Acquire Interests in a Second VHF Station in Major Markets to be Designated for Hearing, 3 Pike & Fischer RR 2d 909 (1964) (3 RR 2d). That temporary policy required, in the absence of a compelling affirmative showing, an evidentiary hearing on any application for the acquisition of a VHF station in one of the top fifty television markets if the applicant already owned or had interests in one or more VHF stations in those markets, or if the applicant sought to acquire interests in two or more VHF stations in the largest markets. It was enacted in response to a trend towards "concentration of such multiple ownership in the largest markets where the numbers of viewers reached are greatest and where diversity of interests and viewpoints should be maximized." Id. at 910.
 
 
 3
 In 1965, the FCC proposed a rule prohibiting the ownership of three or more television stations, or more than two VHF stations, in the top fifty markets. Notice of Proposed Rulemaking, 5 Pike & Fischer RR 2d 1609 (1965) (5 RR 2d). In conjunction with the commencement of a notice-and-comment-rulemaking-proceeding, the agency adopted a second interim policy designating for hearing any applications the granting of which would be inconsistent with the proposed rule, unless a compelling showing of public interest was apparent on the face of the application. Interim Policy Concerning Acquisition of Television Broadcast Stations, 5 Pike & Fischer RR 2d 271 (1965). Again, the policy was justified in order to counteract the fact that "(n)ot only is the level of concentration in the larger markets at a high point but it has been increasing." 5 RR 2d at 1612, P 8. In the Commission's then view, the studies indicated "an apparent trend toward more VHF stations coming under group ownership in the largest population centers and a corresponding decline in the number of single station owners... We are also concerned that the future growth of UHF-which has its greatest immediate potential in these large markets-may follow the VHF pattern." Id. at 1613, P 10.
 
 
 4
 The Commission concluded its comment and analysis period in 1968, and decided not to adopt a rule but to continue with the top-fifty market restrictions as a Policy. Report & Order, 22 FCC 2d 696, 700, P 17 (1968) (22 FCC 2d).
 
 
 5
 In 1978, the agency again issued a notice of proposed rulemaking, initiating an inquiry into whether the Policy should be continued, modified, or repealed and, if retained, whether it should be as a policy or a rule. Notice of Inquiry & Proposed Rulemaking, 68 FCC 2d 837 (1978) (68 FCC 2d). The Commission specifically requested comments on whether the Policy discouraged applicants who did not feel they could meet the public interest requirement. Id. at 840-41.
 
 
 6
 In December 1979, after having received comments from various television group owners and Citizens Communications Center ("Citizens") and the National Black Media Coalition ("NBMC"), the Commission decided not to adopt a rule and to repeal the Policy. Report & Order, 75 FCC 2d 585 (1979) (75 FCC 2d). The agency concluded that there was no problem of concentration of ownership requiring a rule or policy, and that a top-fifty rule or policy was unnecessary, given the other multiple ownership rules. Id. at 597, P 37. These findings were confirmed in denying a petition for reconsideration made by the NAACP. Denial of Reconsideration, 82 FCC 2d 329 (1980) (82 FCC 2d). Petitioner filed its petition for review by this court on November 20, 1980.
 
 II
 
 7
 Under Congress's general formulation in the Administrative Procedure Act, 5 U.S.C. § 706, of the basic criteria for review of administrative agency determinations, the standards for scrutiny of informal agency action, adopting policies or rules, have often been explicated and need not now be redeveloped. Briefly, such agency action is presumed to be valid in the absence of a substantial showing to the contrary. Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 283 n.28, 292 (D.C.Cir.1981); Ethyl Corp. v. EPA, 541 F.2d 1, 34, 37 (D.C.Cir.), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The court's review is not merely a summary endorsement, however, but should be searching and careful. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). While the level of review is not to be perfunctory it is relatively narrow and designed only to ensure that the agency's decision is not contrary to law, is rational, has support in the record, and is based on a consideration of the relevant factors. FCC v. Nat'l Citizens Committee for Broadcasting, 436 U.S. 775, 803, 814-15, 98 S.Ct. 2096, 2116, 2121-22, 56 L.Ed.2d 697 (1978); Food Marketing Institute v. ICC, 587 F.2d 1285, 1289 (D.C.Cir.1978); Almay, Inc. v. Califano, 569 F.2d 674, 680-81 (D.C.Cir.1977); Ethyl Corp., 541 F.2d at 36. This includes the agency's addressing the significant comments made in the rulemaking proceeding. Alabama Power Co. v. Costle, 636 F.2d 323, 384-85 (D.C.Cir.1979).
 
 
 8
 The administrative action must be upheld if it is not arbitrary or capricious,[3] or a clear error of judgment.[4] Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 290, 95 S.Ct. 438, 441, 444, 42 L.Ed.2d 447 (1974). This court has summarized the relevant standard for review of this type in Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031 (D.C.Cir.1979):
 
 
 9
 We will exercise relatively careful scrutiny to ensure that the ... (agency) has scrupulously followed ... (required) procedures ... As part of this oversight we will demand that the Commission consider reasonably obvious alternative ... rules, and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review. At the same time, however, our review of the Commission's factual, and particularly its policy, determinations will perforce be a narrow one, limited to ensuring that the Commission has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record. Finally, we must see "whether those facts and legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made." (footnotes and citations omitted).
 
 
 10
 606 F.2d at 1053.
 
 
 11
 In this instance, our review is heightened somewhat by the fact that the FCC's action in ending the Top-Fifty Policy was a reversal of a prior position. See, e.g., State Farm Mutual Automobile Insurance Co. v. Department of Transportation, 680 F.2d 206 at 228-230 (D.C.Cir.1982); Wheaton Van Lines, Inc. v. ICC, 671 F.2d 520, 527 (D.C.Cir.1982); NRDC, 606 F.2d at 1049-50 n.23; CBS v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Agencies may modify or repeal existing policies and rules as the conditions which they address change, Nat'l Citizens Committee for Broadcasting, 436 U.S. at 797, 98 S.Ct. at 2113, and a court should defer to the administrative judge as to whether conditions have in fact changed and what action, if any, is now warranted. Malrite T. V. of New York v. FCC, 652 F.2d 1140, 1149 (2d Cir. 1981); NRDC, 606 F.2d at 1052; Food Marketing Institute, 587 F.2d at 1293-94. The test is still whether the agency's decision is rational and based on the record. Nat'l Tour Brokers Assn. v. ICC, 671 F.2d 528, 532-33 (D.C.Cir.1982). But where policy has been altered, the court should be satisfied both that the agency was aware it was changing its views and has articulated permissible reasons for that change, and also that the new position is consistent with the law. State Farm, at 228-230; Baton Rouge Marine Contractors, Inc. v. FMC, 655 F.2d 1210, 1217 n.23 and accompanying text (D.C.Cir.1981); Hatch v. Federal Energy Regulatory Comm'n, 654 F.2d 825, 834-35 (D.C.Cir.1981); Baltimore & Annapolis RR Co. v. Washington Metropolitan Area Transit Comm'n, 642 F.2d 1365, 1370 (D.C.Cir.1980); Pacific Legal Foundation v. Department of Transportation, 593 F.2d 1338, 1343-44 (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979); C & H Transportation Co. v. ICC, 589 F.2d 565, 575 (D.C.Cir.1978), cert. denied, 440 U.S. 911, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979).[5]
 
 III
 
 12
 In implementing the standard of review discussed in Part II, supra, we can summarily put aside two major points. First, the Commission was plainly aware that it was changing a long-standing policy. It recognized the existence of the policy and the various goals sought to be achieved by it. Order, 75 FCC 2d 585; Reconsideration, 82 FCC 2d 329. This is not a case where an agency amends its policies or rules without seeing or acknowledging the change. See CBS v. FCC, 454 F.2d at 1026-27.
 
 
 13
 Second, the Top-Fifty Policy is not demanded by the authorizing legislation. The statute requires only that the FCC promote for "all the people of the United States a rapid, efficient, Nationwide, and world-wide wire and radio communication service" and that such service shall be regulated as "public interest, convenience, and necessity" requires. 47 U.S.C. §§ 151, 309(a), 310(b) (1976). These general provisions certainly do not mandate, in themselves, retention of the Policy. Regulation in the public interest is defined broadly, and under that gauge much discretion and flexibility are given to agencies to devise their regulations to meet changing circumstances. Action for Children's Television v. FCC, 564 F.2d 458, 479 n.36 and accompanying text (D.C.Cir.1977). Moreover, an agency's interpretation of its statute "should be followed unless there are compelling indications that it is wrong ..." Id., citing Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). The Commission obviously thinks (and has always thought) that Congress did not compel it to adopt the Top-Fifty Policy, and there is nothing in the governing legislation marking that agency view as wrong.
 
 IV
 
 14
 We turn, applying the standards outlined in Part II, supra, to the core of the rationale for the Commission's dropping of the Top-Fifty Policy and the present attacks on that position.
 
 
 15
 A. The prime component of the Commission's now-challenged view is that, contrary to its former belief, the FCC now thinks that the Policy has not significantly aided the non-concentration of ownership of television stations. There is no doubt that the Policy was originally adopted to halt what the FCC then perceived to be a potentially harmful rising level of concentration of ownership of television stations in the largest markets.[6] When the Commission came, in its recent rulemaking proceeding, to evaluate that Policy, it measured potentially harmful concentration in three respects: (1) the number of different owners in the top fifty markets; (2) the percentage of singly-owned outlets in the top fifty markets; and (3) the degree to which access to the nation's television households is concentrated in a few owners. 75 FCC 2d at 593, P 25. The FCC's independent analysis of the ownership data indicated to it, under any of these criteria, no substantial trend towards an increase in concentration.
 
 
 16
 During the decade of the Policy's existence, there was no significant decrease in the number of television owners nationwide.[7] From 1968 to 1978 the number of owners with three or more stations in the fifty largest markets increased as a percentage of the total number of owners from 18.5% to 20%, an increase from 25 to 27, while there was a 3.3% drop, 94 to 91, in the number of singly-owned stations. 75 FCC 2d at 594, PP 26, 27. At the same time the total number of stations increased from 230 to 242 while the total number of owners in those markets remained constant. Id.
 
 
 17
 Petitioner does not, for the most part, disagree with these findings,[8] or with the Commission's view of economic concentration. The claim is, rather, that the FCC's prior view was that any decrease in the number of owners, even if insubstantial, warranted continuance of the Policy. According to the NAACP, the agency's present belief that small changes in ownership concentration levels warrant dropping the Policy is a change requiring a more compelling justification. We cannot agree.
 
 
 18
 The Commission has not ignored or ridden roughshod over its previous concern with multiple ownership. The extensive compilation of data and analysis indicate the agency's continuing concern with economic concentration. But the Commission could permissibly find that the original basis of the Policy was a perceived dangerous trend[9] which has not continued to materialize. 75 FCC 2d at 596, P 34. See 22 FCC 2d at 696, 698, P 9; 3 RR 2d at 909, 910. It is within the administrative discretion to drop the Policy in response to what are plainly insubstantial changes in concentration levels over the preceding decade. Indeed, an agency should not continue to regulate unless it can clearly identify the harm it seeks to remedy. Home Box Office Inc. v. FCC, 567 F.2d 9, 40-42 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Certainly, a court should not substitute its judgment for that of the administrative body on this point. American Radio Relay League, Inc. v. FCC, 617 F.2d 875, 879 (D.C.Cir.1980); Pacific Legal Foundation, 593 F.2d at 1343.
 
 
 19
 The NAACP also argues that the decrease in the trend toward concentration of ownership may have been attributable to the existence of the Policy itself. It is said that the Commission did not meet its burden of proving that no harmful effects would flow from repeal of the Policy, but relied instead on a barren record in assessing the impact the Policy had on investment decisions.
 
 
 20
 The Commission's finding on the effect of ending the Policy was that "there is no data whatever to indicate that the Policy worked to deter the filing of any additional top-fifty proposal. In fact, no party suggested, much less proved, that the Policy had an effect on anyone's investment decision." 75 FCC 2d at 590, P 17. Petitioner maintains that this indicates that the FCC improperly shifted the burden of proof to the complainants-that the agency should have done an independent study and compelled broadcasters and potential investors to testify as to the effect of the Policy, if any, on their investment decisions (citing Nat'l Ass'n of Independent Television Producers & Distributors v. FCC, 502 F.2d 249 (2d Cir. 1974) ("NAITPD")).
 
 
 21
 We conclude that an independent investigation of such motives was not required. An agency need not seek out all available information on the subject before it but must attempt to have all viewpoints represented.[10] Petitioner's views were directly represented in the administrative proceedings by the National Black Media Coalition and the NAACP. They could have submitted testimony of experts on the impact of the Policy. Indeed, such information was requested by the FCC. 68 FCC 2d at 841, PP 13, 14.
 
 
 22
 It is important, too, that greater discretion is given administrative bodies when their decisions are based upon judgmental or predictive conclusions. FCC v. Nat'l Citizens Committee for Broadcasting, 436 U.S. 775, 813-14, 98 S.Ct. 2096, 2121-22, 56 L.Ed.2d 697 (1978); Stereo Broadcasters, Inc. v. FCC, 652 F.2d 1026, 1031 (D.C.Cir.1981). In a similar case, the Supreme Court in FCC v. WNCN Listeners Guild, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981), found that the FCC's determination as to how to best promote programming diversity was necessarily based on its prognostications and less amenable to rigid proof. 450 U.S. at 595-96, 101 S.Ct. at 1274-75. Such predictions are more in the nature of policy decisions entitled to substantial deference, not calling for complete and specific factual support in the record. Id. at 594-95, 101 S.Ct. at 1274-75; ACT, 564 F.2d at 479.
 
 
 23
 In this instance, the Commission was concerned with diversity, an elusive concept entitling that body to rely on its own judgment. See National Citizens, 436 U.S. at 796-97, 98 S.Ct. at 2112-13. In such a matter, the Commission has leeway to balance the competing policy considerations[11] and, with due regard to the record and its own expertise, choose an appropriate course of action. WNCN, 450 U.S. at 596, 101 S.Ct. at 1275; Nat'l Citizens, 436 U.S. at 813-14, 98 S.Ct. at 2121-22; Malrite, 652 F.2d at 1152 n.17. Based on the measurable decrease in the rising trend in ownership concentration, the consistent waiver of the Policy (see infra ) and its administrative experience, the FCC judged that the Policy was having a negligible effect on investment decisions. While it might have been preferable to have had more complete information on this issue, we find sufficient and rational support for the agency's position.
 
 
 24
 Furthermore, the Commission had other rational grounds upon which it decided that repeal of the Policy would not harmfully affect levels of concentration. First, for the entire decade the Policy was in effect, all applications for exceptions to it were granted without a hearing; the agency decided that each application met on its face the required showing of a compelling public interest. 75 FCC 2d at 586, P 4; 68 FCC 2d at 839, 840, PP 10, 12. The Commission could infer from this history that enforcement of the Policy could have had no effect other than deterring applications by those who felt they could not meet the public interest requirement, and there is no evidence of such a limited deterrent impact. It was not unreasonable to conclude that the Policy, as implemented, was ineffective, see Nat'l Tour Brokers Ass'n v. ICC, 571 F.2d at 533. Insofar as petitioner claims that the Policy was improperly implemented by the grant of too many waivers, we do not find any requirement that, having analyzed and considered the effect of the Policy as it was actually carried out, the FCC was required to go further and scrutinize the past individual waivers to redetermine their correctness.
 
 
 25
 The Commission also concluded that the Policy did not diminish the barriers to program or advertising competition. 75 FCC 2d at 596, P 32. This followed, in the Commission's view, from the existence of alternative multiple ownership rules that indirectly minimize potential economic concentration in the top-fifty markets-primarily the seven-station rule limiting a single owner to 5 VHF stations and a total of seven TV stations, 47 C.F.R. § 73.636(a)(2) (1981).[12]
 
 
 26
 The impact of these rules is challenged by petitioner which says that they are not specifically directed at limits within the top fifty markets and that, despite the existence of these rules, concentration levels are still at the same levels, if not slightly higher, as they were in 1968 when the Policy was adopted.
 
 
 27
 True, the seven station rule and the others do not limit concentration to the same extent as the Policy. Nevertheless, the Commission found that under these rules a group owner could potentially reach only 28% of the nation's households and that the actual experience is that 74% of the largest group owners reach less than 5% of United States households, 96% reach less than 15% and none reaches more than 25%. 75 FCC 2d at 595-96, PP 29, 30. The maximum prime time audience reached by any group owner's stations would appear to be less than 5% of United States homes.[13] 82 FCC 2d at 331, P 5; 75 FCC 2d at 592, P 21.
 
 
 28
 While it may be that the Commission could have defined more precisely what level of concentration it considers harmful, we have to agree that it was certainly within its discretion and area of expertise to find these potential levels not so threatening that the Top-Fifty Policy should be retained. The question is not simply whether competition and diversity could be improved by a limit on the holdings of group owners, but whether a formal policy or rule is required. The Commission is "vested with broad discretion in determining how much weight should be given to ... (the goal of program diversity) and what policies should be pursued in promoting it." WNCN, 450 U.S. at 600, 101 S.Ct. at 1277. See also ACT, 564 F.2d at 479; Malrite, 652 F.2d at 1147. As we have pointed out, the discretionary authority of the agency is broader, and a finding of its irrationality harder to make, when its decisions are based not on simple, hard facts but on predictive judgments as to the future effects of present acts.
 
 
 29
 We cannot say that the repeal of the Policy significantly impairs the FCC's authority to forestall future trends towards unacceptable levels of group ownership. A license may still be granted only when it would be in the public interest.[14] 47 U.S.C. § 309(a) (1976). See Nat'l Ass'n of Regulatory Utility Commissioners v. FCC, 525 F.2d 630, 635 (D.C.Cir.), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976) ("NARUC"); 75 FCC 2d at 591 n.9. This provision has been held to require a consideration of the effect the granting of a particular license would have on the goal of diversity of program sources. Nat'l Citizens, 436 U.S. at 795, 98 S.Ct. at 2112. This element may include, in turn, some consideration of the effect of minority interests. Gottfried v. FCC, 655 F.2d 297, 308-09 (D.C.Cir.1981), cert. granted, --- U.S. ----, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982) (citing NAACP v. FPC, 425 U.S. 662, 670 n.7, 96 S.Ct. 1806, 1812 n.7, 48 L.Ed.2d 284 (1976)). It would be reasonable for the Commission to be continually alert to modify its present lack of a Policy if concentration levels worsen. See WNCN, 450 U.S. at 603, 101 S.Ct. at 1279; NARUC, 525 F.2d at 638. While the FCC did not require divestiture previously, we cannot now say that it wholly lacks that authority if the level of concentration rises so substantially as to necessitate more drastic action.
 
 
 30
 B. It is said, finally, that repeal of the Policy was improper because the Policy was effective in increasing minority programming and employment. These kinds of public benefits were elicited from applicants attempting to make the public interest showing under the Policy. We accept that the Policy was used successfully in connection with these objectives, but we are unable to hold that the agency had to retain the Policy in order to attain them.
 
 
 31
 The particular goals to be emphasized, and the means of their achievement, are basically for the FCC, not this court. The Top-Fifty Policy was not intended directly to promote these minority interests but only to ensure a diversity of program sources. 82 FCC 2d at 333, P 12, 337, P 22. The Commission enforces several programs and regulations that more directly promote and have an impact on minority ownership, employment and programming for stations in all size markets.[15] Each licensing decision must include an analysis of whether it would be in the public interest, a requirement that includes an examination of Equal Employment Opportunity-related objections. 82 FCC 2d at 335 n.19; 75 FCC 2d at 599 (separate statement of Commissioner Ferris). The Commission has not improperly exercised its discretion by relying on these tools, rather than the Top-Fifty Policy, to advance minority goals.
 
 V
 
 32
 The sum of it is that, applying the standards for judicial review of an administrative policy decision of this kind, we conclude that the Commission's repeal of the Top-Fifty Policy passes muster, and its decision is
 
 
 33
 Affirmed.
 
 
 
 *
 Of the United States Court of Claims, sitting by designation
 
 
 [1]
 Petitioners are the National Association for the Advancement of Colored People, the Office of Communication of the United Church of Christ, the National Council of La Raza, the National Organization for Women, the National Media Committee and the Citizens Communications Center (referred to collectively as the NAACP or Petitioner)
 Several parties have intervened in this appeal; Metromedia, Inc.; Corinthian Broadcasting Corp.; Channel Five Television Co.; Channel Two Television Company; Cosmos Broadcasting Corp.; Guy Gannet Broadcasting Services; Multimedia, Inc.; Newhouse Broadcasting Corp.; Providence Journal Co.; United Television, Inc.; General Electric Broadcasting Co., Inc.; and, American Broadcasting Companies, Inc.
 
 
 [2]
 Since April 1, 1974, the determination of the top fifty markets has been based on the American Research Bureau Market rankings
 
 
 [3]
 There has been a continuing debate over the level of judicial scrutiny required under this test, as compared to review for substantial evidence. See 5 U.S.C. § 706(2)(A), (E) (1976). Some courts have recognized that in judicial review of rulemaking these two standards tend to converge into a requirement of a reasonable application of the facts in the rulemaking record to the eventual rule. Superior Oil Co. v. Federal Energy Regulatory Comm., 563 F.2d 191, 199 (5th Cir. 1977); Associated Industries v. Department of Labor, 487 F.2d 342, 349-50 (2d Cir. 1973). We have said that the distinction between the two levels of review is "largely semantic." Pacific Legal Foundation v. Department of Transportation, 593 F.2d 1338, 1343 n.35 (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979)
 
 
 [4]
 Clear error of judgment is not synonymous with "clearly erroneous." Almay, 569 F.2d at 680; Ethyl Corp., 541 F.2d at 34-35 n.74. It is a more limited criterion of review. Id
 
 
 [5]
 Intervenors argue that (1) repeal of the Policy is wholly nonreviewable since it was only a general statement of policy and the articulation of a procedural format (relying on Meredith Broadcasting Co. v. FCC, 365 F.2d 912 (D.C.Cir.1966)), and also that (2) petitioners lack standing to bring this suit. We reject both contentions
 Revocation of a policy, restricting broadcast ownership, after a rulemaking proceeding on that particular policy, is judicially reviewable. See NRDC, 606 F.2d at 1047. In this case there is an ample record available for review since the Commission conducted a rulemaking proceeding prior to establishing the Policy, 22 FCC 2d 696, and again prior to its rejection. 68 FCC 2d 837. Repeal of a long-standing policy is not totally within the discretion of an agency to such an extent that its decisions are unreviewable even for arbitrariness and capriciousness. See, e.g., FCC v. WNCN Listeners Guild, 450 U.S. 582, 600-03, 101 S.Ct. 1266, 1277-79, 67 L.Ed.2d 521 (1981). Meredith is distinguishable as concerned only with reviewability of the FCC's enactment of an interim policy prior to rulemaking proceedings. 365 F.2d at 914-15.
 Petitioners, as a group of citizens interested in diverse programming sources and affected by ownership concentration patterns, have standing to bring this suit that seeks to preserve a policy originally designed to ensure diversity through multiple ownership limitations. See WNCN Listeners Guild, 450 U.S. at 585, 101 S.Ct. at 1269.
 
 
 [6]
 The FCC has isolated two goals to be achieved by its various multiple ownership rules: "preservation of the diversity of sources of news and information and the prevention of undue economic concentration." 75 FCC 2d at 591, P 18. See also id. at 585-86, and Part I, supra
 
 
 [7]
 The Policy was adopted to promote national programming diversity and was not intended to affect local programming directly. 75 FCC 2d at 591-92, PP 19, 20
 
 
 [8]
 The NAACP does argue that the Commission overestimated the total number of operating stations by including, in the figures for singly-owned stations, stations with construction permits. The contention is that stations with such permits often never begin actual operation. In addition, the NAACP maintains that the agency inappropriately included singly-owned on-the-air UHF stations since those are usually purchased after three years by group owners. Petitioner does not, however, quantify the effect on the statistical results of these alleged errors. More importantly, the Commission's data are not inaccurate. Only stations operating with construction permits, as opposed to merely being licensed, were included in the data. 82 FCC 2d at 341, P 33; 75 FCC 2d at 594 n.16. The inclusion of new, not yet profitable, UHF stations does not skew the results. The figures are used to compare concentration levels from 1968, the base year, to 1978. And new UHF stations were included in the statistics for both years, the number remaining fairly constant. The Commission could also properly conclude that it was of little importance that the stations might be taken over at some point by a group if new stations replaced them. See 82 FCC 2d at 341, P 33
 
 
 [9]
 The number of multiple TV station owners increased from 81 to 134 between 1956 and 1964, representing 23.3% and 40.9% respectively of all station owners. The number of TV stations owned by multiple owners increased from 203 to 372 during the same period, from 43.4% to 65.7% of all stations, while the number of individually owned stations declined from 265 to 194. 3 RR 2d at 910. The total number of commercial VHF stations in the top fifty markets increased by 26 between 1956 and 1964, but the number of owners increased by only three. 5 RR 2d at 1612-13, P 9. The number of single station owners decreased from 55 to 45, or 18%. Id. at 1613. Of the 91 separate owners in the top fifty markets, 28 (31%) controlled 93 VHF stations, or 60% of the total. Id. The Commission's concern was that "there may be a continuation of this trend until the present figure of 91 owners in the top fifty markets is reduced to a much lower number" and that the UHF stations would follow the same trend. Id. at 1613, P 10. See also Part I, supra. That the FCC was concerned, not so much with the existing level of ownership concentration as with the trend, is shown by its refusal to order divestiture of existing groups when it adopted the policy
 
 
 [10]
 The Second Circuit in NAITPD chastised the Commission for failure to obtain comments from all interested parties. 502 F.2d at 258. The court's focus was not on the FCC's obligation to investigate but on the breadth of the interests represented. Id. Even then it did not overturn the agency's decision or remand for further investigation
 
 
 [11]
 Affirmative goals were those set forth in note 6, supra and Part I, supra : diversity of sources, and prevention of undue economic concentration. These must be balanced against a concern for limiting concentration to such an extent that it renders new owners unable to acquire sufficient economic power to compete with existing multiple owners who were not divested of their interests when the Policy was adopted. 68 FCC 2d at 841, P 14; id. at 843-44 (separate statement of Commissioner Fogarty)
 
 
 [12]
 Other rules prevent ownership of: (a) three stations where any are within 100 miles of the third and there is a primary service contour overlap for any of the stations, 47 C.F.R. § 73.636(a)(2) (1981); (b) two stations in the same broadcast service located in the same or overlapping areas, 47 C.F.R. § 73.636(a)(1) (1981); (c) a VHF television station and a radio station in the same market, id.; (d) a broadcast station by a person who owns a daily newspaper in that market, id.; and, (e) a television station and a cable television system in overlapping markets, id. at § 76.501. These rules primarily affect local diversity and touch national diversity only to the extent they restrict the number of stations that can be owned within a particular top fifty market
 
 
 [13]
 These data exclude networks and their affiliates which reach virtually 100% of the homes. Network domination is unaffected by the Policy and is the subject of a separate FCC proceeding. 75 FCC 2d at 595 n.18
 
 
 [14]
 Petitioner mistakenly says that a mere public interest requirement is an insufficient replacement for the Policy which required a compelling public interest showing. First, the level of proof required, as primarily a procedural matter, should be decided by the administrative body so long as it is not in violation of the authorizing statute. Second, waiver of the Policy every time it was requested under the compelling public interest standard suggests that the two standards, as applied, may not be very different
 
 
 [15]
 These include (1) encouragement of minority ownership through the grant of tax certificates to sellers transferring their properties to minority owners, by allowing distress sales to minorities, and the grant of expedited processing of broadcast applications by minority-owned entities, 82 FCC 2d at 335-36, P 17; (2) rules requiring affirmative action and nondiscrimination, 82 FCC 2d at 334, P 14; and, (3) a requirement that applicants for renewal, transfer, assignment or construction permits file Equal Employment Opportunity programs, id