**ABINGTON MEMORIAL HOSPITAL, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, et al., Defendants.**

**MEMORIAL OSTEOPATHIC HOSPITAL, et al., Plaintiffs,**

v.

**Margaret M. HECKLER, et al., Defendants.**

**ALLEGHENY GENERAL HOSPITAL, et al., Plaintiff,**

v.

**Margaret M. HECKLER, et al., Defendants.**

Civ. A. Nos. 82–2856, 82–3465 and 82–3640.

United States District Court, E.D. Pennsylvania.

Dec. 8, 1983.

Jane D. Elliott, H. Buckley Cole and Roland Morris, Philadelphia, Pa., for plaintiffs.

Susan Dein Bricklin, Asst. U.S. Atty., Philadelphia, Pa., Shalom Brilliant, Lewis K. Wise, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

On March 15, 1979, the Secretary of the Department of Health, Education and Welfare—subsequently rechristened the Department of Health and Human Services (HHS)—issued a proposed rule that altered one aspect of the method by which hospitals are reimbursed for their participation in Medicare, the federally funded health insurance program for the aged and disabled. 44 Fed.Reg. 15744. Under Title XVIII of the Social Security Act (the Medicare Act), 42 U.S.C.A. §§ 1395–1395pp (1974 & West Supp.1983), HHS contracts with health-care providers to render medical services to eligible individuals. Providers are entitled to be reimbursed for all "reasonable costs" of providing such services. *Id.* § 1395f. The "Malpractice Rule," which was promulgated in final form on June 1, 1979, revised the formula for calculating the portion of hospitals' malpractice insurance costs attributable to Medicare patients and thus reimbursable by the Medicare program. 44 Fed.Reg. 31641, codified at 42 C.F.R. § 405.452(b)(1)(ii). The new rule significantly reduces the reimbursement made to most hospitals, and has generated virtually unanimous opposition from the nation's hospitals.

Plaintiffs here are non-profit health-care facilities, including acute-care hospitals, hospital-based skilled nursing facilities, and hospital-based home-health agencies. Plaintiffs challenge the rule on three separate grounds: (1) that the Secretary failed to comply with the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553, which governs informal rulemaking; (2) that the Malpractice Rule is arbitrary and capricious and thus violates § 706(2)(A) of the APA; and (3) that the rule is substantively invalid under the Medicare Act because it fails to reimburse hospitals for reasonable costs incurred in providing services to Medicare patients.

I.

Until the Malpractice Rule went into effect in July 1979, malpractice insurance costs—which may take the form of premiums paid to an insurer or payments to a self-insurance fund—were included in the "General and Administrative" category (G & A) of hospital expenses, along with other insurance costs, administrative salaries, and so forth. To apportion G & A costs between Medicare and non-Medicare patients, the G & A total was simply multiplied by the hospital's Medicare utilization

rate (*i.e.*, the percentage of patient bed-days used by Medicare patients).

The March 15 Notice of Proposed Rule-making (NPRM) stated that under the utilization approach the Medicare program paid a disproportionate amount of malpractice costs. 44 Fed.Reg. 15744, 15745 (1979). In support of this conclusion, the Secretary cited a consultant's study, which was interpreted as demonstrating that malpractice awards to Medicare patients were significantly lower than those to other patients, because Medicare patients—being by definition over 65 or disabled—have shorter life expectancies and lower projected future earnings than do other patient populations.

As acknowledged in the preamble to the final rule, public comment was both extensive and unanimously negative, but the final rule was substantially similar to the proposal. As adopted, the Malpractice Rule reimburses a hospital for that percentage of its malpractice insurance costs equal to the dollar ratio of malpractice losses it has paid to Medicare beneficiaries to total malpractice losses paid to all patients during the current and four preceding fiscal years. Thus, if a hospital's insurer has paid $100,000 to Medicare claimants and $200,000 to non-Medicare claimants during that five-year period, the hospital would be reimbursed for one-third of its malpractice insurance costs for the current year. The one element that differed from the proposed rule to the final rule concerned hospitals that have paid no malpractice insurance claims during the past five years. Under the proposed rule, such hospitals were to obtain from an independent actuary an estimate of Medicare's share of current malpractice costs. 44 Fed.Reg. at 15745. The final rule eliminates the requirement of an actuarial estimate and replaces it with a "national ratio" of 5.1%. Thus, hospitals lacking claims-paid experience from the preceding five years will be reimbursed for 5.1% of their insurance

costs for the year. The 5.1% figure was derived from data in the consultant's report.

Plaintiffs first challenged the Malpractice Rule during their annual Medicare reimbursement proceedings in 1980. During such proceedings, fiscal intermediaries,[1] who serve under contract as agents of HHS, review Medicare reimbursements that have been made periodically through the year and adjust for over- or under-payment. Thereafter, plaintiffs requested a hearing with the Provider Reimbursement Review Board (PRRB), an entity established by the Medicare Act, 42 U.S.C. § 1395oo, to hear appeals from intermediaries' reimbursement determinations. *Hospital Association of Pennsylvania Group Appeal*, PRRB Case No. 81–332–G. The appeal disputed the legality of the Malpractice Rule as applied for the year ending June 30, 1980. On its own motion, the Board found that it lacked authority to decide the validity of the Malpractice Rule, because it is bound under 42 C.F.R. § 405.-186 by existing Medicare regulations. The Board accordingly directed expedited judicial review, pursuant to 42 U.S.C. § 1395oo (f)(1). This action was promptly filed in the Eastern, Middle and Western Districts of Pennsylvania; all three cases were transferred to and consolidated in this court.

II.

Plaintiffs first contend that the rulemaking process followed by the Secretary in adopting the Malpractice Rule failed to conform with the Administrative Procedure Act's notice and comment requirements, which apply to informal rulemaking. 5 U.S.C. § 553. Specifically, plaintiffs allege that the notice of proposed rulemaking failed to provide sufficient information to allow for meaningful comment, and that the basis and purpose statement of the final rule was inadequate.

The general test of the adequacy of a Notice of Proposed Rulemaking (NPRM) is whether it "fairly apprise[d] in-

---

**1.** Fiscal intermediaries for plaintiffs include Aetna Insurance Company and several regional    chapters of Blue Cross.

terested parties of all significant subjects and issues involved," allowing the public to "effectively participate in the rulemaking process." *American Iron and Steel Institute v. EPA*, 568 F.2d 284, 291 (3d Cir.1977) (citations omitted). Plaintiffs complain that their participation was seriously hampered because the notice failed to describe the methodology or findings of the study that was the sole empirical basis for the Malpractice Rule. In fact, the NPRM referred only to "a study conducted by an HEW consultant," though the final rule identified the report's author as Westat, Inc. As the D.C. Circuit has recently noted, it is especially important for "[a]n agency to identify and make available technical studies and data that it has employed in reaching the decision to propose particular rules." *Connecticut Light and Power Co. v. Nuclear Regulatory Commission*, 673 F.2d 525, 531 (D.C.Cir.), *cert. denied*, — U.S. —, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982).

■ While the NPRM here challenged is hardly an exemplar by this standard, that defect is not fatal because at least some of the plaintiffs received the consultant's report in time to review it before submitting their comments. *See, e.g.*, comments of the American Hospital Association, Administrative Record Vol. 5, Tab A; the Hospital Corporation of America, Vol. 5, Tab H; the Federation of American Hospitals, Vol. 6, Tab F. Because these organizations represent 6400, 120, and 1,000 hospitals respectively, *id.*, it is not inappropriate to conclude that most interested parties had actual notice, which should be allowed to cure technical defects in notice. *Common Carrier Conference v. U.S.*, 534 F.2d 981 (D.C. Cir.1976), *cert. denied*, 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288. Particularly telling with regard to this case are the comments of the Hospital Association of Pennsylvania, which offered its views "[a]fter a thorough review of the HEW/Westat Study." Vol. 6, Tab H, at 2. Since the Association represents 330 institutions throughout Pennsylvania, plaintiffs here have little cause to complain they lacked effective notice.

■ Plaintiffs also argue that notice was inadequate because it failed to address the one element contained in the final rule that was not present in the proposal, namely, the "national ratio". This is a contention which can be disposed of easily.. As the Third Circuit has stated, "the submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different—even substantially different—from the proposed rule." *American Iron and Steel, supra*, 568 F.2d at 293. The test of adequacy remains whether interested parties were fairly apprised of the issues before the agency. *Id.* Because the NPRM explicitly stated that the rule would cover providers who had not paid any malpractice claims during the past five years, plaintiffs were clearly on notice that the issue was under consideration.

■ Plaintiffs fare better in attacking the Secretary's basis and purpose statement, which they allege fails to respond adequately to public comments on the proposed rule. As the D.C. Circuit has observed, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office v. FCC*, 567 F.2d 9, 35, *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Although the Secretary need not address all issues raised by commenters, the response must be specific enough to allow the reviewing court "to see what major issues of policy were ventilated by the informal [rulemaking] proceedings and why the agency reacted to them as it did." *National Industrial Sand Association v. Marshall*, 601 F.2d 689, 716–17 (3d Cir.1979). Furthermore, "an agency decision may not be reasoned if the agency ignores vital comments regarding relevant factors, rather than providing an adequate rebuttal." *Western Coal Traffic League v. U.S.*, 677 F.2d 915, 927 (D.C.Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 568, 74 L.Ed.2d 931 (1983). It would have been a miracle of bureaucratic succinctness had

the Secretary managed to reply adequately in two scant columns of Federal Register prose to the 600-plus comments that occupy five thick volumes of the administrative record. Unfortunately, no such miracle has been witnessed by this court, which instead finds the Secretary's response woefully inadequate.

Particularly disturbing is the complete lack of response to comments that challenged the statistical validity of the Westat Report, the sole empirical study on which the Malpractice Rule was based. Several commenters questioned the adequacy of the data base. For example, the American Hospital Association noted that providers who self-insure were excluded from the study even though self-insurers constituted 20% of all community hospitals in 1976 and 53% of community hospitals over 500 beds. Administrative Record, Vol. 5, Tab A, at p. 9. The Hospital Corporation of America argued that because the data were collected from only nine insurance companies— out of the 50 which then offered hospital malpractice coverage—and because only claims closed during a four-month period (July to October 1976) were examined, the study offered a quantitatively inadequate sample from which to extrapolate. Vol. 6, Tab H, at 6. The preamble to the final rule contains not a word acknowledging that any commenter criticized the Westat Report; far less did it make an adequate response to those criticisms.

Nor did the Secretary address other points raised by commenters save in a highly conclusory fashion. For example, the American Hospital Association noted that 30% to 40% of the cost of insurance is attributable to administrative expenses such as risk management, and that claims handling expenses (such as incident investigations and legal fees) do not necessarily parallel ultimate payments. Vol. 5, Tab A, at 8. The Association cited a study by the Rand Corporation which concluded that "only about 35 cents of every dollar in

malpractice premiums is paid to successful claimants." · *Id.* at 5–6. In light of these shortcomings, the Secretary's basis and purpose statement cannot be considered adequate.[2]

III.

■ Plaintiffs also contend that adoption of the Malpractice Rule was arbitrary, capricious, and an abuse of discretion, thus violating § 706(2)(A) of the APA. The Supreme Court recently reiterated the proper role for a court reviewing agency action challenged under that provision: to determine "whether the decision was based on a consideration of the relevant factors and whether there had been a clear error of judgment." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* —— U.S. ——, 103 S.Ct. 2856, 2865, 2867, 77 L.Ed.2d 443 (1983) (citations omitted). Plaintiffs argue that the Secretary has committed such an error by basing the Malpractice Rule on inadequate empirical information. Reliance on faulty data has been held to be a clear error of judgment in analogous circumstances. *See Almay, Inc. v. Califano,* 569 F.2d 674 (D.C.Cir.1977). In *Almay,* the D.C. Circuit held that the Food and Drug Administration had acted arbitrarily in adopting a regulation on the basis of a survey, where the director of the bureau that sponsored and designed the survey had seriously questioned the statistical integrity of the survey results. *Id.* at 682.

■ Here, the authors of the Westat Report noted that "conclusions must be drawn very cautiously because of the possibility of biased data." Westat Report, Administrative Record, Vol. 3, at 2–2. One source of bias arose because many hospitals self-insure, and claims against self-insurers obviously could not show up in a survey of claims closed by insurance companies. *Id.* More telling is a memorandum to the HEW project officer in charge

---

**2.** This conclusion makes it unnecessary to reach plaintiffs' argument that the Secretary conducted a "sham" rulemaking that failed to genuinely consider public comments. Absent a more thorough response by the Secretary to comments that were submitted, it is not possible for this court to know whether the Secretary considered those comments or not.

of the Medical Malpractice Study from senior analysts at Westat, who were authors of several chapters of the Final Report. The memorandum's authors noted that the design of the 1976 study made it

> "virtually impossible to generalize beyond the sample ... to annual totals or to national totals, to cite the most elementary limitation. Beyond that, there was no assurance that the sample was in any way representative of hospitals[,] of physicians, of injuries, of geographic regions, of claimants."

Record, Vol. 4, Tab 3.[3]

Of course, an agency need not await perfect data before taking regulatory action. There are limits, however, to the degree of imperfection that is permissible, which the Secretary has surpassed here.

■ Plaintiffs further challenge the rule as arbitrary and capricious, on the grounds that it produces "bizarre and unfair reimbursement consequences" and is inconsistent with other Medicare reimbursement practices.[4] Because the issues raised by this contention are virtually identical to those presented by plaintiffs' challenge to the rule under the Medicare Act, these issues are addressed in Part IV.

## IV.

■ Finally, plaintiffs contend that the Malpractice Rule is substantively invalid under the Medicare Act because it fails to reimburse hospitals for insurance costs reasonably incurred in treating Medicare patients.[5] The Act requires that hospitals be reimbursed for "reasonable costs or customary charges," whichever is less. 42 U.S.C. § 1395f(b). The parties to this litigation agree that it is the "reasonable costs" standard which is involved here. The Act's definition of reasonable costs is lengthy but leaves the Secretary considerable discretion to adopt regulations specifying methods for determining reasonable cost. *Id.* § 1395x(v)(1)(A). The statute does specify, however, that "the reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Id.* Furthermore, the Act requires that reimbursement standards "take into account both direct and indirect costs ... in order that ... the necessary costs of efficiently delivering covered services to [Medicare patients] will not be borne by [non-Medicare patients]." *Id.*

The government argues that the Secretary should be accorded substantial deference in establishing the method or methods for determining reasonable costs. Of course, this court cannot overrule the Secretary's interpretation merely because it might have interpreted the term "reasonable cost" in another fashion. *See Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct.

3. Plaintiffs submit lengthy affidavits that detail additional flaws in the Westat Report. These are not properly before this court, however. A reviewing court may consider evidence outside the administrative record only for background information or to determine if the agency examined all relevant factors or adequately explained its decision; a court may *not* consider outside evidence in substantively evaluating an agency's course of action. *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (D.C.Cir.1980.)

4. Although a court may not substitute its judgment for that of the agency and must keep in mind that judicial oversight of agency actions is narrow in scope, *State Farm, supra,* 103 S.Ct. at 2866, such oversight plays an especially important role where, as here, an agency's policies are in flux. *Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C.Cir.1970). While agencies must have latitude to adapt their regulations to changed circumstances, *State Farm, supra,* 103 S.Ct. at 2866, new regulations must be fairly reasoned and considered, *State Marine Int'l v. Peterson,* 518 F.2d 1070 (D.C.Cir.1975), *cert. denied,* 424 U.S. 912, 96 S.Ct. 1108, 47 L.Ed.2d 316 (1976). Review of regulatory amendments should thus proceed under the standards that govern other informal rulemaking.

5. Plaintiffs also allege that in promulgating the malpractice rule, the Secretary violated the statutory directive to "consider ... the principles generally applied" by insurance companies. 42 U.S.C. § 1395x(v)(1)(A). In making that argument, plaintiffs appear to disregard the distinction between "considering" such principles and being bound by them. Because the malpractice rule is being remanded on several other grounds, however, it is not necessary to deal at length with the merits of this position.

2399, 2405, 53 L.Ed.2d 448 (1977). Nonetheless, as the Supreme Court recently noted:

> [W]hile reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act ... they must not 'rubberstamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."

*Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* —— U.S. —— at ——, 104 S.Ct. 439 at 444, 78 L.Ed.2d 195 (1983) (citations omitted.) *See also Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980) ("Even though the Medicare reimbursement area is complex, and to a great degree left to the Secretary to structure, his interpretations are nonetheless subject to our examination.") *Bethlehem Steel v. EPA,* 651 F.2d 861, 867 (3d Cir.1981).

In determining the validity of the plaintiffs' challenge under the Medicare Act and under § 706 of the APA,[6] we must examine how the rule operates in practice. Under the rule, a hospital is reimbursed for that percentage of its malpractice insurance costs equal to the dollar percentage of malpractice awards it has paid in the past five years to Medicare (as opposed to non-Medicare) patients. Thus, if a hospital had three malpractice claims within that time, one of which, for $100,000, was paid to a Medicare patient, and the remaining claims, for $200,000, involved non-Medicare claimants, the hospital would be reimbursed for one-third of its malpractice premiums for the current reporting period. If all three claims had been paid to Medicare patients, the hospital would be reimbursed for 100% of its malpractice insurance expenditures; but if all three claims had been paid to

non-Medicare patients, then the hospital would receive not one cent in reimbursement. The Malpractice Rule takes no account of the hospital's rate of utilization by Medicare patients, so the figures in the above example would apply regardless of whether 1% or 99% of the hospital's patients were Medicare recipients. If a hospital has paid no malpractice claims at all during the past five years, reimbursement is figured according to the national ratio currently set at 5.1%. Such hospitals would be reimbursed for only 5.1% of their malpractice insurance costs, again without regard to their Medicare utilization levels.

The government argues that the Secretary has acted within permissible discretion in establishing a rule that reimburses hospitals under the Medicare program according to the portion of malpractice loss that Medicare patients have historically created. The superficially appealing logic of this formulation, however, entirely neglects two key facts: first, a hospital's malpractice insurance premiums are not established solely with reference to its paid claims history,[7] and second, malpractice insurance does not function solely to ensure that assets will be available to cover a successful claimant's damages. This latter fact is itself a function both of the nature of insurance and of Pennsylvania law. Under 40 Pa.Cons.Stat.Ann. § 1301.701, all hospitals must carry malpractice insurance. Such insurance is thus a necessary, though indirect, cost of providing health care to Medicare patients, because a Pennsylvania hospital cannot provide any services absent such insurance.

Furthermore, malpractice insurance protects an insured's assets against losses that could otherwise threaten its financial sta-

---

**6.** The section of the Medicare Act that establishes the Provider Reimbursement Review Board provides for judicial review of PRRB decisions "pursuant to the applicable provisions under chapter 7 of Title 5." 42 U.S.C.A. § 1395*oo*(f)(1) (West Supp.1983). Similar review is available where, as here, the PRRB has determined that it is without authority to decide the question presented. *Id.*

**7.** Instead, "the total cost of protection is a direct function of the provider's annual bed occupancy and outpatient utilization." Comment on behalf of the Chicago Hospital Risk Pooling Program, Administrative Record, Vol. 5, Tab C.

bility.[8] Continuity of service benefits all patients, Medicare and other. To the extent that malpractice service costs represent the cost of protecting hospital assets, they are "reimbursable to the extent that this indirect cost benefitted [M]edicare patients." *Presbyterian Hospital v. Harris*, 638 F.2d 1381, 1386 (5th Cir.), *cert. denied*, 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981). Clearly, the extent of benefits to Medicare patients is not simply a function of how many Medicare versus non-Medicare claims a hospital has paid during the past five years, and the Malpractice Rule consequently fails to reimburse actual costs incurred by hospitals.

The statute plainly requires that indirect costs be allocated so as to ensure that non-Medicare patients do not bear costs attributable to Medicare patients, and vice-versa. Since we are dealing with indirect costs, there is in any such allocation, almost by definition, an element of uncertainty. Reasonable estimates and extrapolations are certainly permissible; mathematical precision is not to be expected. But this does not mean that the Secretary is free to choose an allocation formula which is least likely to reflect reality—indeed, as in this case, a formula which seemingly guarantees that the statutory mandate will inevitably be violated in most cases.

It bears repeating that the following facts are, on this record, undisputed: (1) the ratio between malpractice claims paid on account of Medicare patients and malpractice claims paid on account of non-Medicare patients over the most recent five-year period has very little, if any, relationship to the hospital's current cost of maintaining malpractice protection. (2) The "national average" (currently estimated at 5.1%) of that ratio has even less bearing on the current malpractice coverage costs of any particular hospital. (3) The data relied upon in the Westat Report, including the data which produced the 5.1% figure, included both payments made to satisfy the liability of hospitals and claims paid to satisfy the liability of physicians. There is no evidence to support the conclusion that these combined payments provide reliable information about the malpractice payment experience of hospitals. Indeed, there is reason to believe that they do not: It would seem that Medicare patients stand a greater chance of being injured through the negligence of non-physician personnel than younger patients. (4) A very substantial portion—certainly in excess of 50%—of malpractice coverage expense is attributable to claim-handling, litigation, and other expenses unrelated to the amounts paid to claimants. Since the Westat data say nothing about the numbers of claims handled in each category, or the expenses attributable thereto, and since they include only payments in excess of applicable deductibles, even these limited data are open to serious challenge, not addressed in the administrative record.

It is not appropriate for this Court to attempt to specify what method of apportioning malpractice insurance costs should be adopted, notwithstanding plaintiffs' implicit argument to the contrary. And I certainly do not mean to suggest that the Secretary's perception that the exposure to malpractice insurance claims and costs attributable to non-Medicare patients is greater than that attributable to Medicare patients is necessarily invalid, or cannot be reflected in the allocation formula adopted. But, while the previous utilization rate method of allocation is not the only possible method, it seems self-evident that any method of allocation which totally ignores utilization rates fails to meet the requirements of the statute.

For the reasons discussed above, I have concluded that the Secretary violated the notice and comment provisions of the APA in adopting the malpractice rule, and that

---

8. This purpose is recognized in the Medicare Provider Reimbursement Manual, published by HHS, which states that a provider must maintain "an adequate insurance program to protect itself against likely losses, particularly losses so great that the provider's financial stability would be threatened." (HIM–15) CCH Medicare & Medicaid Guide ¶ 5999X (emphasis added).

the rule itself is arbitrary and capricious, and fails to conform to the substantive provisions of the Medicare Act. I recognize that these conclusions run counter to other reported decisions on these questions. To date, four other courts have upheld the position of the Secretary. *Athens Community Hospital v. Heckler*, 565 F.Supp. 695 (E.D.Tenn.1983); *Cumberland Medical Center v. Heckler*, 578 F.Supp. 39 (M.D.Tenn.1983); *Humana of Aurora, Inc. v. Heckler*, No. 83–7–70 (D.Colo. Sept. 19, 1983); and *Walter O. Boswell Memorial Hospital v. Heckler*, 573 F.Supp. 884 (D.C.C.1983). After careful consideration, I find myself unable to agree with those decisions.

The *Cumberland* and *Humana* courts merely followed the lead of the *Athens Community Hospital* court, without discussion. And the opinion of the *Athens* court reflects a rather limited analysis of the issues, as is evidenced by the fact that the administrative record appears not to have been part of the docket before the *Athens* court (see docket sheet, Appendix A to affidavit of H. Buckley Cole, Exhibit C of plaintiffs' memorandum in response to defendants' reply memorandum). I find it difficult to square this approach with the "searching and careful" review mandated by *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Moreover, the *Athens* court did not address the anomalous results that the rule produces in practice.

A more complete exploration of the issues involved here is contained in the opinion of my esteemed colleague, Judge Bryant, in the *Boswell* case. Judge Bryant obviously was troubled by the "cloudy" aspects of the administrative record, and found the issue of substantive compliance with the Medicare Act the "thorniest" problem in the case, but the opinion reflects his ultimate conclusion that, in the long run, the imbalances created by the rule would probably balance out in the case of any particular hospital. If there is a distinction between *Boswell* and the present case, it lies in the fact that the Boswell plaintiff had a high percentage of Medicare patients and might therefore actually benefit from the new rule, in the long run. In the present case, I am not at liberty to indulge such an assumption. Be that as it may, with all due deference to the contrary opinions of other judges, I remain unpersuaded that the rule is valid.