**LLOYD NOLAND HOSPITAL AND CLINIC, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. CV83–PT–0868–S.**

United States District Court, N.D. Alabama, S.D.

April 5, 1984.

2

Eric L. Carlton, Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., John T. Ward, Leonard C. Homer, Margaret M. Manning, Ober, Grimes & Shriver, Baltimore, Md., for plaintiff.

Frank W. Donaldson, U.S. Atty., N.D. Ala., Herbert J. Lewis, III, Asst. U.S. Atty., Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

PROPST, District Judge.

This cause comes before the court on the parties' cross motions for summary judgment. Plaintiff seeks a determination that the "malpractice rule," 42 C.F.R. § 405.-452(b)(1)(ii), is invalid because it was promulgated in violation of the Administrative Procedures Act (A.P.A.), 5 U.S.C. § 701 *et seq.*, and because it is in substantive conflict with the provisions of the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A).

Plaintiff is a "provider of services" as defined in 42 U.S.C. § 1395cc. As such, plaintiff agrees not to charge Medicare patients for services covered by Medicare, and is in return reimbursed for the "reasonable cost" of those services, 42 U.S.C. § 1395f(b)(1)(A). Prior to the promulgation of the "malpractice rule," plaintiff was reimbursed for the cost of obtaining medical malpractice insurance as part of its administrative and general (A & G) costs. Such costs were reimbursed based on the percentage utilization of the hospital's facilities by Medicare patients. During the cost year ending in 1980, 32% of the hospital's services were used by Medicare patients. Prior to the promulgation of the malpractice rule, the hospital would therefore have been entitled to reimbursement of 32% of its medical malpractice insurance costs. The malpractice rule provides that:

> For costs reporting periods beginning on or after July 1, 1979, costs of malpractice insurance premiums and self-insurance fund contributions must be separately accumulated and directly apportioned to Medicare. The apportionment must be based on the dollar ratio of the provider's Medicare paid malpractice losses to its total paid malpractice losses for the current cost reporting period and the preceding four year period. If a provider has no malpractice loss experience for the five year period, the costs of malpractice insurance premiums or self-insurance fund contributions must be apportioned to Medicare based on the national ratio of malpractice awards paid to Medicare beneficiaries to malpractice awards paid to all patients. The Health Care Financing Administration will calculate this ratio periodically based on the most recent departmental closed claim study ...

42 C.F.R. § 405.452(a)(1)(ii). The applicable national ratio was initially set at 5.1%. Since plaintiff had no malpractice loss experience for the five year period ending in 1980, its fiscal intermediary determined

plaintiff's reimbursement of malpractice premiums at the 5.1% rate. The difference between the 5.1% national rate and the 32% utilization rate apparently amounts to $13,191.00. (Complaint at 5). Plaintiff appealed the intermediary settlement for the cost year ending in 1980 to the Provider Reimbursement Review Board (PRRB), which on February 18, 1983, issued a notice that it lacked the authority to determine the validity of the malpractice regulation. Plaintiff filed this action on April 22, 1983, sixty-three days later. Jurisdiction is alleged pursuant to 42 U.S.C. § 1395oo (f)(1) and 28 U.S.C. § 1331.

The court notes at the onset that several other district courts have decided the identical question presented by this case. Five courts have invalidated the malpractice rule. *See Abington Memorial Hospital v. Heckler*, 576 F.Supp. 1081 (E.D.Pa.1983) (J. Fullam); *Mt. Carmel Mercy Hospital v. Heckler*, 581 F.Supp. 1311 (E.D.Mich.1983) (J. DeMascio), *Chelsea Community Hospital v. Heckler*, No. 83CV–6126–AA (E.D. Mich. Dec. 20, 1983) (J. Jointer); *St. James Hospital v. Heckler*, 579 F.Supp. 757 (N.D. Ill.1984) (J. Will); *Humana of Illinois, Inc. v. Heckler*, 584 F.Supp. 618 (C.D.Ill.1984). Four courts have upheld the rule. *See Athens Community Hospital v. Heckler*, 565 F.Supp. 695 (E.D.Tenn.1983) (J. Taylor), *appeal docketed*, No. 83–5546 (6th Cir. August 5, 1983); *Cumberland Medical Center v. Heckler*, 578 F.Supp. 39 (M.D. Tenn.1983) (J. Morton), appeal docketed, No. 83–5549 (6th Cir. Aug. 9, 1983); *Humana of Aurora, Inc., d/b/a Aurora Community Hospital v. Heckler*, No. 83–2–70 (D.Colo. Sept. 19, 1983) (J. Weinshienk), *appeal docketed*, No. 83–2417 (10th Cir. Nov. 4, 1983); *Walter O. Boswell Memorial Hospital v. Heckler*, 573 F.Supp. 884 (D.D.C.1983) (J. Bryant), *appeal docketed*, No. 83–2223 (D.C.Cir. Dec. 2, 1983). No circuit court opinions have been brought to the court's attention.[1]

---

1. Plaintiff has advised the court that two other decisions invalidating the Malpractice Rule were filed on March 2, 1984, *Albany General Hospital v. Heckler*, No. 83–357 (D. Oregon) and

*St. Joseph's Hospital, Tuscon v. Heckler*, No. 82–781 (D.Ariz.) The court has not yet obtained copies of these decisions. The trend in the more recent cases has been to invalidate the

**4**

## I. *Jurisdiction*

The court has raised, *ex mero motu*, a question regarding its jurisdiction. 42 U.S.C. § 1395*oo* (f)(1) provides in part:

Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is *received.* Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which such determination is *rendered.*

42 U.S.C. § 1395*oo*(f)(1) (emphasis added). The determination of the PRRB was evidently made pursuant to the expedited procedure provided by the second sentence in the above passage, since its determination was that it "lacked the authority to determine the validity of the malpractice regulation." (Complaint at 7, ¶ 27). As mentioned earlier, this action was not filed until 63 days after the PRRB's determination was *rendered.* It was filed within sixty days of plaintiff's *apparent receipt* of the determination on February 24, 1983. (*See* Appendix to Complaint). The letter from the PRRB informing plaintiff of the Board's determination states: "The providers have 60 days from the receipt of this letter to institute the appropriate action for judicial review." (Appendix to Complaint).

 Federal courts must scrupulously confine their own jurisdiction to the precise limits that a federal statute has defined. *Victory Carriers, Inc. v. Law,* 404 U.S.

202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383 (1971); *Owen Equipment and Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The parties may not create federal jurisdiction by express consent, by their conduct or even by estoppel. *American Fire and Casualty Co. v. Finn,* 341 U.S. 6, 17–18, 71 S.Ct. 534, 541–42, 95 L.Ed. 702 (1951); Wright, Miller and Cooper, *supra,* § 3522 at pp. 46–47. The court is persuaded, however that the sixty-day period provided for appeal is in the nature of a statute of limitations and is not a prerequisite to jurisdiction. Because of the similarity between the appeals mechanisms contained in the Social Security and Medicare Acts, decisions interpreting the Social Security Act's provisions control similar issues arising under the Medicare Act. *See V.N.A. of Greater Tift County, Inc. v. Heckler,* 711 F.2d 1020, 1024 (11th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). The time limitations for filing suit under the Social Security Act are statutes of limitation, and not prerequisites to jurisdiction. *Weinberger v. Salfi,* 422 U.S. 749, 763–64, 95 S.Ct. 2457, 2465–66, 45 L.Ed.2d 522 (1975); *Mathews v. Eldridge,* 424 U.S. 319, 328, n. 9, 96 S.Ct. 893, 899, n. 9, 47 L.Ed.2d 18 (1976). The same is therefore true of the sixty-day limitations period in question in this case. Since defendant has not raised this defense in a timely manner, it is waived. Fed.Rule Civ. Pro. 8(c); *Salfi, supra,* 422 U.S. at 764, 95 S.Ct. at 2466. Even if the statute of limitation was not waived, the court is of the opinion that the letter from the PRRB tolled the statute so that plaintiff's time for filing this appeal would not expire until 60 days from the receipt of the letter. Accordingly, the court has subject matter jurisdiction over this appeal.

## II. *Compliance with the Administrative Procedures Act*

### A. *Standard of Review.*

Appeals from the decision of the PRRB pursuant to 42 U.S.C. § 1395*oo* (f) "shall be

---

Rule. This court agrees with the *Abington* case's analysis of the decisions upholding the

Rule. *See Abington, supra,* 576 F.Supp. at 1090.

tried pursuant to the applicable provisions under Chapter 7 of Title 5 [the Administrative Procedures Act].…" 42 U.S.C. § 1395oo (f)(1). Plaintiff's claims for declaratory relief also allege non-compliance with the Administrative Procedures Act. 5 U.S.C. § 706 provides that a reviewing court shall:

"hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; …

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case … otherwise reviewed on the record of an agency hearing provided by statute.…

5 U.S.C. § 706. The Supreme Court recently articulated the guidelines which the court must follow in determining whether the malpractice rule was properly promulgated. It stated:

[A] reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute … The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." … In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." … Normally an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the prob-

lem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." … "We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443, 457–58 (1983).

B. *Insufficiency of the Notice of Proposed Rule Making (NPRM).*

Plaintiff contends that the Notice of Proposed Rule Making (NPRM) published by the Secretary on March 15, 1979 (44 Fed. Reg. 15,744–45; Agency Record at Vol. II, Tab 54) did not comply with the requirements of the Administrative Procedures Act (A.P.A.), 5 U.S.C. § 553. Section 553 states in part:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved. 5 U.S.C. § 553. The leading case concerning this portion of the A.P.A. is *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9 (D.C.Cir. 1977). The court there held that "the notice required by the A.P.A., or information subsequently supplied to the public, must disclose *in detail* the thinking that has animated the form of a proposed

rule *and the data upon which that rule is based.* *Id.* 567 F.2d at 35 (Emphasis added). Plaintiff argues that because the NPRM failed to disclose the name of the study which provided the factual basis for the malpractice rule (the "Westat study"), it was deprived of the opportunity to make informed and intelligent comments and criticisms of the proposed rule, particularly with regard to the statistical validity of the Westat study as it applies to the malpractice rule (*See* discussion *infra* at 8). The NPRM provided in relevant part:

*A study conducted by an HEW consultant* indicates that malpractice awards for Medicare and Medicaid patients are significantly lower in amount than losses for other patient population. The lower awards for these patients result because their income potential and life expectancy are less than the remainder of the patient population. Thus, the use of overall Medicare utilization to allocate malpractice costs results in Medicare paying for a disproportionate amount of malpractice costs.

44 Fed.Reg. 15744, 15745 (March 15, 1979) (emphasis added). It is not disputed that the "study conducted by an HEW consultant" is in fact the Westat study. The Secretary in the preamble to the final rule in fact specifically identified the Westat study as the study relied on. 44 Fed.Reg. 31641 (June 1, 1979).

■ Defendant contends that although the Westat study was not named in the NPRM, leading hospital organizations were aware that the "study" referred to was the Westat study and in fact made comments to the Secretary prior to the promulgation of the final rule based on the Westat study. *See, e.g.,* comments of the American Hospital Association, Agency Record Vol. 5, Tab A; the Hospital Corporation of America, Vol. 5, Tab H; the Federation of American Hospitals, Vol. 6, Tab F. These organizations apparently represent 6400, 120, and 1000 hospitals, respectively. *Id., see also Abington, supra,* 576 F.Supp. at 1085. It is thus evident that even though the NPRM may have been technically insufficient,

most interested parties had actual notice of the "study" in question. Notice is adequate if "it affords interested parties a reasonable opportunity to participate in the rulemaking process." *Forester v. Consumer Product Safety Comm'n,* 559 F.2d 774, 787 (D.C.Cir.1977). Since many interested parties had actual notice of the name of the study in question, the court cannot conclude that the regulation should be invalidated for failure to specifically name the study relied upon. *Accord, Abington, supra,* 576 F.Supp. at 1085.

■ A more serious challenge to the sufficiency of the NPRM is the Secretary's failure to provide access to the *data* relied upon in the Westat study. An agency has a duty "to identify and make available technical studies *and data* that it has employed in reaching the decision to propose particular rules." *Connecticut Light and Power Co. v. Nuclear Regulatory Comm'n,* 673 F.2d 525, 531 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982) (Emphasis added). Plaintiff asserts in its brief that the data upon which the Westat study was based was not released by the Secretary until sometime in 1980. (Plaintiff's opposition to Defendant's brief at 5). Plaintiff contends that until its expert had an opportunity to analyze the data upon which the Westat study relied, they had no basis for criticizing the study's statistical validity, especially as it applies to hospitals. The court agrees that the data upon which the Westat study was premised should have been made available to the interested parties in time for a proper analysis and meaningful comment to be made regarding the proposed regulation. *See U.S. Lines v. Federal Maritime Comm'n,* 584 F.2d 519, 534–36 (D.C.Cir.1978). The court cannot say, however, on the record before it, that this was not done. Plaintiff has not cited the court to any evidence of record to indicate when the data was released; its unsubstantiated assertions in its brief will not suffice.

■ Plaintiff next attacks the sufficiency of the NPRM on the basis that the

agency initially gave interested parties 45 days to comment rather than the sixty days required by Executive Order 12044. 43 Fed.Reg. 12661 (March 23, 1978). The agency did extend the period allowed for public comment, but not until May 1, 1979, the final day of the initial forty-five day comment period. 44 Fed.Reg. 25476 (May 1, 1979). Plaintiff argues that most interested parties rushed to submit their comments prior to May 1, and that by implication the comments were not as thorough as they would otherwise have been. Although the court recognizes the inconvenience which may have been caused plaintiff by the agency's action, the fact remains that a total of sixty days was allowed. The regulation cannot be struck down on this basis. *Accord, St. James, supra,* 579 F.Supp. at 763; *Athens, supra,* 565 F.Supp. at 698.

Plaintiff's final attack on the sufficiency of the NPRM is that it failed to give notice of the "national ratio" element of the final rule. The proposed rule provided for an actuarial estimate to be made of Medicare's share of malpractice insurance costs and be applied to reimburse hospitals with no malpractice loss over the five-year period in question. The final rule substituted a "national ratio" to be computed by the Health Care Financing Administration for this actuarial estimate. The initial "national ratio" was set at 5.1%, apparently based on an extrapolation from the Westat study data. This change in the final rule does not invalidate the rule, however, unless the interested parties were thereby not adequately appraised of the issues before the agency. *See Abington, supra,* 576 F.Supp. at 1085. "[T]he submission of a proposed rule for comment does not of necessity bind an agency to undertake a new round of notice and comment before it adopts a rule which is different—even substantially different—from the proposed rule." *American Iron and Steel Institute v. E.P.A.,* 568 F.2d 284, 293 (3d Cir.1977). The "Supplemental Information" portion of the NPRM hinted at the "national ratio" method, albeit not in connection with the case of a provider without malpractice loss

experience. The Secretary stated: "Medicare is aware that other statistics could be used for the apportionment basis, such as: (1) a national ratio of Medicare malpractice paid losses as opposed to a single provider's malpractice loss experience ..." 44 Fed.Reg. at 15745. The court cannot say that plaintiff was not apprised of the issues before the agency. The NPRM therefore gave plaintiff sufficient notice to justify the addition of the "national ratio" portion of the final rule.

C. *Sufficiency of the Basis and Purpose Statement*

An agency promulgating a regulation is required to provide a "basis and purpose" statement with the regulation and to respond to the comments received regarding the rule. Plaintiff contends that the Secretary failed to provide such a statement and failed to address several significant criticisms regarding the malpractice rule. 5 U.S.C. § 553(c) provides in part:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose . . .

5 U.S.C. § 553(c). This statute requires the agency to *consider* relevant comments and then incorporate a "concise general statement" of the rule's "basis and purpose." The courts have interpreted this "basis and purpose" requirement to mean that the agency must address, and if necessary rebut, significant comments made regarding a proposed rule. "[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office v. F.C.C.,* 567 F.2d 9, 35, *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). "[A]n agency decision may not be reasoned if the agency ignores vital comments regarding

relevant factors, rather than providing an adequate rebuttal." *Western Coal Traffic League v. U.S.*, 677 F.2d 915, 927 (D.C.Cir. 1982), *cert. denied* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). The purpose of this basis and purpose statement has been said to be to provide a reviewing court sufficiently detailed information to allow it to determine how and why the regulations were adopted. "In particular, the statement must advert to administrative determinations of a factual sort to the extent required for a reviewing court to satisfy itself that none of the regulatory provisions were framed in an 'arbitrary' or 'capricious manner.'" *National Welfare Rights Organization v. Mathews*, 533 F.2d 637, 648 (D.C.Cir.1976), *citing Amoco Oil Co. v. E.P.A.*, 501 F.2d 722, 739 (D.C.Cir. 1974).

The basis and purpose statement was published along with the final rule on June 1, 1979 at 44 Fed.Reg. 31641–42. The statement purported to respond "to the most significant comments" received. It recognized that "All comments received were against the proposal and recommended that we withdraw it entirely." 44 Fed.Reg. at 31641. The comments were then grouped into four categories: (1) Opposition to the Direct Apportionment of Malpractice Costs; (2) Direct Assignment of Overhead Costs; (3) Cash Flow; and (4) Claims Management. The entire basis and purpose statement is contained in two columns of the Federal Register. The most disturbing aspect of the basis and purpose statement is the total lack of response to the numerous comments which questioned the statistical validity of the Westat study. *Accord, Abington, supra,* 576 F.Supp. at 1086; *St. James, supra,* 579 F.Supp. at 764. Among these comments were those of the American Hospital Association, which noted that hospitals which were self-insured were excluded from the study although they constituted 20% of all community hospitals in 1976 and 53% of community hospitals over 500 beds. Agency Record, Vol. 5, Tab A, April 30, 1979 letter of American Hospital Association at 9. The same letter went on to point out that

the authors of the Westat study characterized their study as a "census of claims" rather than a "sample" and admitted that "[i]t is probable that the percentages shown in the different categories ... are an underestimate of the actual proportion." *Id.* at 9–10. The Hospital Corporation of America's April 27, 1979, letter similarly noted that "the Westat study itself refers to significant biases that raise profound questions as to whether there is sufficient basis for the proposed rule. The biases include the following: 'the data base only involved claims closed by 9 of 50 insurance companies over a four month period and is not representative of an adequate sample ...'" Agency Record, Vol. 6, Tab H, Hospital Corporation of America's April 27, 1979, letter at 6. The letter also noted the Westat study's own caution that "conclusions must be drawn very cautiously because of the possibility of biased data." *Id.*, Westat study at 2–3. In the face of these and other comments challenging the validity of the Westat data, the basis and purpose statement neither acknowledged nor addressed this problem.

The basis and purpose statement also fails to address several other comments critical of the malpractice rule. The American Hospital Association commented, for example, that 30% to 40% of the cost of insurance is attributable to administrative expenses and that reimbursement based on claims paid did not adequately compensate for these expenses. Agency Record, Vol. 5, Tab A, letter of April 30, 1979, at 8. The Hospital Corporation of America in its April 27, 1979, letter quoted a Rand study to the same effect. "Indeed, the legal apparatus required to determine negligence and place blame is so expensive that only about 35 cents of every dollar in malpractice premiums is paid to successful claimants." Agency Record, Vol. 6, Tab H, letter of April 27, 1979, at 5–6. The basis and purpose statement ignored these and other substantive challenges to the proposed regulation. This is true even though internal agency documents reveal that there was an awareness of the problem. A letter dated

May 18, 1979, from the office of the General Counsel for the Department of Health, Education and Welfare stated:

> We have technical problems with HCFA–147 ... We do not believe the preamble is adequate. Nor do we believe it is clearly written. HCFA received some 450 public comments on the NPRM. All of the public comments opposed the proposed regulations. Therefore, we believe that HCFA needs to carefully explain why it is rejecting the public comments.

Agency Record, Vol. 2, part II, Tab 49.[2]

■ Since it appears from the record that the basis and purpose statement failed to address several significant and relevant criticisms of the proposed rule, the court is compelled to agree with the *Abington* and *St. James* courts that the statement was inadequate. As Judge Fullam noted: "It would have been a miracle of bureaucratic succinctness had the Secretary managed to reply adequately in two scant columns of Federal Register prose to the 600 plus comments that occupy five thick volumes of the administrative record. Unfortunately, no such miracle has been witnessed by this court, which instead finds the Secretary's response woefully inadequate". *Abington, supra,* 576 F.Supp. at 1086.

### D. *Arbitrary and Capricious.*

As noted previously, 5 U.S.C. § 706 provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ..." Plaintiff claims that the malpractice rule was promulgated in an arbitrary and capricious fashion and is therefore due to be set aside.

It appears from the record that the agency decision to implement the malpractice rule was made in response to budgetary pressures well in advance of the formal publication and approval mandated by the A.P.A. An internal agency note on Febru-

ary 22, 1979 summarized the proposed rule and stated:

> The regulation results in an estimated $11 million budget savings for the final quarter of FY 79 and $310 million for FY 80.
>
> This regulation conforms with the agreements negotiated during the budget process. It must be published at the beginning of March *in order* to *fulfill our commitment* to *implement by July 1.*

Agency Record, Vol 1, Part I, Tab 29 (emphasis added). The Department's budget proposals for FY 1980, which were circulated on January 23, 1979, and released on January 22, 1979, stated: "The Department *will publish* regulations that will base Medicare and Medicaid reimbursement for hospital malpractice insurance costs upon the actual experience of Federal beneficiaries, rather than on their rate of utilization of hospital services as is current practice." Agency Record, Vol. 1, Part I, Tab 25 (Emphasis added). In a memo circulating the NPRM on February 16, 1979, the Administrator of the Health Care Financing Administration stated: "If the direct apportionment of malpractice costs is not implemented ... expenditures would exceed the budgeted amounts for FY's 1979 and 1980 ... Since final regulations establishing the new apportionment procedure must be effective for part of the FY 1979 ... the (N.P.R.M.) must be published as soon as possible ..." Agency Record, Vol. 1, Part I, Tab 28.

■ As noted earlier, the Agency initially set a forty-five day period for public comment only to extend it on the last day to the required sixty days. *See supra* at 6–7. The record reflects, however, that in its attempt to implement the rule in time for the "savings" to be realized in FY 1979, the Agency began the process of finalizing the rule well before the period for comments was closed. The final rule, including the basis and purpose statement which purported to address the public comments, was apparently drafted prior to

---

**2.** One of the more serious deficiencies in the basis and purpose statement is the failure of the Secretary to address the issue discussed *infra* at 11–12.

April 24, 1979—six days before the end of the abbreviated forty-five day comment period. Agency Record, Vol. 1, Part II, Tab 42. The rule as finally promulgated was circulated on May 15, 1979, the last day of the sixty day period, and contained essentially the same basis and purpose statement as was included in the April 24, 1979, draft. Since the final rule was prepared and circulated before the period for public comment was closed, it is obvious that there was no adequate consideration of those comments. It is similarly obvious from the Agency Record that budget pressure was the overriding consideration in the implementation of the rule. Allowing budgetary pressures to override the A.P. A.'s mandate that public comments be considered is not in keeping with the promulgation of an administrative rule pursuant to a statute requiring the reimbursement of the "reasonable cost" of services. 42 U.S.C. § 1395x(v).

 Reliance on faulty data in the promulgation of a rule is also a basis for finding that the rule was issued in an arbitrary manner. The D.C.Circuit in *Almay, Inc. v. Califano,* 569 F.2d 674, 682 (D.C. Cir.1977), held that agency reliance on a survey which was "flawed" was a clear error of judgment and impermissibly arbitrary. The Westat study, the sole factual basis for the malpractice rule, warned that "conclusions must be drawn very cautiously because of the possibility of biased data." Agency Record, Vol. 3 at 2–2. A memorandum from senior Westat analysts to the HEW official in charge of the study dated August 17, 1978, stated:

> The 1976 study involved a census of claims closed by nine private sector carriers over a four month period. With such a sample design, it was virtually impossible to generalize beyond the sample—to annual totals or national totals, to cite the most elementary limitations. Beyond that, there was no assurance that the sample was in any way representative, of hospitals, of physicians, of injuries, of georgraphic regions, of claimants.

Agency Record, Vol. 4, Tab 37. The same memo went on to say that "a closed claim sample is not a representative sample of physicians or hospitals (i.e. insureds) involved in medical malpractice." *Id.* Despite these warnings, the Secretary used the Westat study to attempt to prove exactly what its authors had cautioned against— generalizations about national totals and hospitals. The court recognizes that an agency does not have to have perfect data before taking regulatory action. *See Abington, supra,* 576 F.Supp. at 1087. However, the court is compelled to conclude that when the agency relies on a study for propositions which the study's authors specifically note are not supported by its data base, such reliance is an error of judgment and arbitrary. *Accord, Abington, supra,* 576 F.Supp. at 1087; *St. James, supra,* 579 F.Supp. at 766.

III. *Substantive Conflict with the Medicare Act.*

Plaintiff's final contention is that the malpractice rule is not consistent with and does not further the purposes of the Medicare Act. 42 U.S.C. § 1395f(b) provides that: "The amount paid to any provider of services ... shall be ... the lesser of (A) the reasonable cost of such services ... or (b) the customary charges with respect to such services ..." 42 U.S.C. § 1395f(b)(1). "Reasonable cost" is defined elsewhere as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). The Secretary is authorized to establish regulations to determine "actual costs," with the limitation that "Such regulations shall (i) take into account both direct and indirect costs of providers of services ... in order that ... the necessary costs of efficiently delivering covered services to individuals covered (by the Medicare Act) will not be borne by individuals not so covered ..." 42 U.S.C. § 1395x(v)(1)(A). The Secretary is further ordered to consider "among other things, the principles generally applied by national organizations or established prepayment

organizations ... in computing the amount of payment to be made ... to providers of services ..." *Id.*

Plaintiff alleges that the malpractice rule runs afoul of the Medicare Act in several respects. First of all, it is argued that by isolating malpractice insurance costs from other General and Administrative (A & G) costs, the "averaging" principle by which such costs have traditionally been reimbursed is defeated and the providers are underpaid for other A & G costs. Under the "averaging" principle, A & G costs are grouped into a "cost center." Medicare then reimburses the provider for a portion of the total cost center based on the percentage of Medicare patients who utilize the hospital. It is expected that the providers will be overpaid by Medicare for some particular costs and underpaid for others. When all the costs are grouped together, however, these costs are presumed to "average out" so that Medicare actually pays for approximately its share of all A & G expenses. The Secretary maintains that malpractice insurance costs should not be as high for Medicare patients as for other patients, since Medicare patients are older as a group, do not have as great an earning potential, and therefore are not awarded as much in malpractice claims as are other patients. As a result, it is argued that malpractice insurance costs should be singled out for "discrete costing"—in effect removing malpractice insurance costs from the A & G cost center and reimbursing providers for those costs separately, according to the formula laid out in the malpractice rule. The plaintiff on the other hand cites the court to numerous cases in which providers have sought to have various A & G costs which are attributable *solely* to Medicare discretely costed. In all such cases, the Secretary has denied the providers' requests, maintaining that "it is impractical to isolate discrete items of general and administrative cost between Medicare and non-Medicare beneficiaries ..." (*Methodist Hospital, Brooklyn, N.Y. v. Blue Cross/Blue Shield of Greater New York*, [1979–2 Transfer Binder] *Medicare and Medicaid Guide* (CCH) ¶ 30,086,

PRRB Hearing Dec. No. 79–053, Aug. 17, 1979), and that "[t]he balance of the averaging technique would be distorted if the provider were allowed to discrete cost certain elements of its own choosing." PRRB Hearing Decision No. 82–D46, Feb. 2, 1982, [1982 Transfer Binder] *Medicare and Medicaid Guide* (CCH), ¶ 31,810 at 9070. Plaintiff argues that the Secretary is, in effect, discrete costing elements of *its* own choosing, while denying providers the right to do likewise.

The record reveals that the agency was aware of this objection and had evidence before it indicating that if all items which could be discrete costed were, the net effect would be an *increase* in the amounts Medicare would be obligated to reimburse. *See* Agency Record, Vol. 2, Tab 36; Vol. 1, Tab 22; Vol. 1, Tab 19. It also appears that the practice of pooling A & G costs was a traditional practice of the hospital industry and third-party payors prior to the inception of the Medicare program. Agency Record, Vol. 1, Tab 19. The court recognizes that plaintiff's argument is logically persuasive, however, the court cannot say on the evidence before it at this time that the agency action was unreasonable. There is simply no *evidence* before the court at this time which would prove that the malpractice rule has disrupted the balance of the averaging scheme. In view of the broad power of the agency to use "different methods in different circumstances," 42 U.S.C. § 1395x(v)(1)(A), the court likewise cannot say that failure to abide by traditional methods of reimbursement is contrary to the Medicare Act.

Plaintiff also challenges the regulation on the basis of that it fails to reimburse the "cost actually incurred," 42 U.S.C. § 1395x(v)(1)(A), by providers with respect to malpractice insurance premiums attributable to Medicare patients. Plaintiff illustrates this argument by positing the following admittedly extreme hypotheticals based on the application of the malpractice rule to a hospital with a 60% Medicare utilization rate and annual malpractice premiums of $100,000:

(1) If the hospital, during the relevant five year period specified by the challenged regulation, pays only one malpractice claim, no matter what the amount, to a Medicare recipient, Medicare will reimburse the hospital $100,000 or 100% of its malpractice insurance costs;

(2) If, instead of paying a single malpractice claim to a Medicare recipient, the same amount is paid as the result of a claim by a non-Medicare recipient, Medicare will reimburse the hospital *none* of its malpractice insurance costs;

(3) If the hospital makes no payments on malpractice claims during the relevant five-year period, Medicare will reimburse the hospital only $5,100 or 5.1% of its malpractice insurance costs.

Plaintiff's Brief at 49. Under the pre-malpractice rule method of reimbursing providers, each of the hospitals would have been reimbursed $60,000 or 60% of their malpractice insurance costs. Plaintiff cites these incongruous results as evidence of the fallacy of mechanically linking *losses paid* with *actual costs*.

 It is undisputed that under current insurance practices, insurance premiums are determined primarily by a hospital's utilization and occupancy rates, and only secondarily by an institution's loss history. *See* Chicago Hospital Risk Pooling Program comments, Agency Record, Vol. 5, Tab C. It is similarly undisputed that the ratio between losses paid to Medicare beneficiaries and those paid to non-Medicare patients and the 5.1% "national ratio" have very little, if any, relationship to a hospital's *actual* cost of obtaining malpractice insurance. *Accord, Abington, supra,* 576 F.Supp. at 1089. It is further undisputed that a significant portion of malpractice insurance costs cover expenses unrelated to claims *paid,* such as the administrative expenses of claims-handling, loss control program expenses, and legal fees. Finally, it is undisputed that maintaining liability insurance is a *necessary* cost of business for hospitals; they cannot exist without such insurance. (*See* Medicare Provider Reimbursement Manual, CCH Medicare and Medicaid Guide, paragraph 5999x.) Malpractice insurance premiums are an actual, although indirect, expense to hospitals providing services to Medicare beneficiaries, whether or not any claims are paid. Since the malpractice rule mechanically ties reimbursement to losses paid, a factor which bears little relationship to a hospital's actual cost of obtaining malpractice insurance, it is inconsistent with the statute's mandate that the regulations reimburse "the cost actually incurred ..." taking into account "both direct and indirect costs of providers of services ..." 42 U.S.C. § 1395x(v)(1)(A). Similarly, it violates the same statute's prohibition against non-Medicare beneficiaries bearing costs attributable to providing services to Medicare beneficiaries. The court agrees with the *Abington* and *St. James* courts that the Secretary has chosen "an allocation formula which is least likely to reflect reality ... a formula which seemingly guarantees that the statutory mandate will inevitably be violated in most cases." *Abington, supra,* 576 F.Supp. at 1089; *St. James, supra,* 579 F.Supp. at 767.

## IV. *Conclusion.*

For the above-stated reasons, the court finds that the malpractice regulation, 42 C.F.R. § 405.452(b)(1)(ii), is invalid because it lacks an adequate basis and purpose statement and was promulgated in an arbitrary and capricious manner, both of which cause it to violate the Administrative Procedures Act, and because it is in substantive conflict with the provisions of the Medicare Act. Plaintiff's Motion for Summary Judgment is therefore due to be granted and defendant's is due to be denied. Within five days after the filing of this Memorandum Opinion, plaintiff will submit a proposed final judgment. Defendant will have five days to file objections as to form.